In the Matter of the Claim of RACHINA CORRINA, Widow, Respondent, against JAMES DeBARBIERI and Another, Appellants.

STATE INDUSTRIAL BOARD, Respondent.

Third Department, November 17, 1927.

Workmen's compensation — injury arising out of and in course of employment — decedent was driver of horse-drawn truck — while truck was on ferry boat decedent fell asleep — before he was awakened at ferry slip team started and he fell from truck — decedent did not suffer injury in course of employment.

The decedent, who was engaged as a driver of a horse-drawn truck, was not within the course of his employment when he fell from the truck and suffered injuries from which he died. The decedent drove his truck onto a ferry boat and while thereon he lay down on the seat of the truck and fell asleep and did not awaken when the ferry boat reached the slip on the opposite shore. A deckhand on the ferry boat endeavored to arouse the decedent but before he could do so, the horses started and the decedent fell from the truck.

HINMAN, J., dissents, with opinion.

Third Department, November, 1927.　　　[Vol. 221

Appeal by James DeBarbieri and another from awards of the State Industrial Board, made on the 24th day of August, 1926, and on the 24th day of June, 1927.

*Frederick Mellor* [*Richard F. Weeks* of counsel], for the appellants.

*Albert Ottinger, Attorney-General* [*E. C. Aiken, Assistant Attorney-General*, and *Alexander A. Tausky, Deputy Attorney-General*, of counsel] for the respondent State Industrial Board.

*Philip J. O'Brien*, for the claimant, respondent.

McCann, J. The employer was an ice and coal dealer. The decedent was a driver. The findings of the State Industrial Board are as follows: " On July 26, 1926, while the said Stephen Corrina was engaged in the regular course of his employment, and while working for his employer, and while driving a team of horses hitched to a coal wagon, and while said wagon was on a ferry boat, plying between New York City and Jersey City, the deceased dozed off to sleep, lying lengthwise on the seat of said coal wagon, and when the boat reached the Jersey City slip, a deckhand attempted to arouse the deceased, and was thus engaged when the team of horses started and walked off the boat, whereupon the deceased was jolted off the seat upon which he was lying, and the wagon passed over him, and he thereupon sustained injuries in the nature of fractured ribs, punctured lung, internal injuries, lacerated face and shock, and from which injuries he died on July 27, 1926, his death being naturally and unavoidably the result of the injuries which deceased sustained on July 26, 1926."

Appellants claim that the injuries and resultant death (1) did not arise out of and in the course of the employment; (2) the Industrial Board had no jurisdiction to make the award appealed from because the decedent sustained a maritime injury; (3) the decedent was engaged in interstate commerce at the time of the injury and the State Industrial Board had no jurisdiction. The last point is not urged on the appellants' brief.

The findings of the Industrial Board are sustained by the evidence as to the facts. They do not, however, sustain the conclusion of law that the accident arose out of and in the course of the employment. The findings are based principally upon the testimony of Paul Hay, who testified that he was a deckhand and that on the day in question decedent " was asleep on his back in the truck in the gangway. I went up and tried to wake him up and before I could wake him up the team started, ran away, and he fell off and the wagon run over him." At that time the lines were not in decedent's hands. The other passengers had gone off the boat. Hay went to see what was the matter and found the decedent

lying on the broad of his back lengthwise of the seat and crosswise of the truck and while Hay was trying to awaken the decedent, the team started.

There is no question but that the decedent's death was the result of the accident. The employer testified that decedent had worked for him about eighteen years; that he employed Mr. Corrina to drive this team of horses; that he could not tell whether any of his drivers ever dozed off to sleep while crossing the river; that he would not consider it a violation of the employment, nor would he discharge an employee for dozing off and going to sleep while crossing the river; that it was a common thing for men who got up early in the morning to do so. The evidence shows that Corrina had no definite time for arising in the morning but got up very early, sometimes at three or four A. M. It also appears that there was no definite time for him to complete his work; sometimes it was ten or twelve o'clock in the evening before he finished his day's work. It took from five to ten minutes to cross the ferry. He stated he could not object and would not object to a man sleeping while crossing the river " *as long as the man turned out his work;* " that he had often driven a team of horses himself and laid down to sleep while crossing the ferry just to take a ten minutes rest. He also testified that there was no rule regarding sleeping on the ferry boat and that it was not a recognized custom so to do, although the largest number of the drivers did so. He further stated that the *driver was responsible for the team from the time he left his place of business in the morning until he returned with the team and that the driver should have been awake to drive the team off the boat.*

The main question is whether Corrina was at the time of the accident engaged in his employment. The Industrial Board was of the opinion that *Cleveland* v. *Rice* (209 App. Div. 257; affd., 239 N. Y. 530) controls, but in my opinion that case is not analogous to the one at bar. In that case there was a contract of employment by which the claimant was hired by the keeper of a livery stable to take a horse and cutter and drive a patron some distance and return to the stable with the horse and cutter. An exigency arose which had not been anticipated by either party. After leaving his customer at his destination and while on his return trip the driver fell from the cutter, taking a robe with him. The horse continued on its journey and returned safely to the stable. It was one A. M. and in the country. The claimant wrapped himself up in his robe and sat down in the snow to wait for a vehicle which might by chance be passing, where he might procure a ride back to his destination. Claimant *unintentionally* fell asleep. Several hours thereafter he was discovered by a resident of a house in the

immediate vicinity and was by him conveyed to his destination. Later in the day he discovered that his left foot had been frozen. The opinion in that case, by this court, states: " Going to sleep was not inconsistent with any duty which the claimant could or should have rendered his employer under existing circumstances." It was there held as matter of law that it could not be said that the duty of the driver was to pursue the horse because he could not render any assistance and further such service was unnecessary. The court held that as an incident of his employment claimant was protected by the Workmen's Compensation Law until he reached his destination at Cuba, provided he used reasonable and proper means to that end. His employment clearly included his return to Cuba.

The case is unlike the present case as here the decedent was employed to care for this team of horses. It cannot be said that the horses needed no care while on the ferry boat. The conditions and surroundings required as much care as when on the public highway; the noise and movement of automobiles, blowing of the whistle, the movement of the boat and of the passengers, made it the duty of this driver to have his attention upon the horses he was driving as much as a duty of a watchman was to keep his attention on a building or its contents. If this were not so, there would have been no necessity for hiring a driver to accompany this team.

In *Cleveland* v. *Rice* (*supra*) in the Court of Appeals attention is called to the fact that the driver unintentionally fell asleep. Here it was different. From all the circumstances it is reasonable to infer that the decedent *voluntarily* arranged himself in a comfortable position and laid down for the purpose of taking a nap, as in the case of *Matter of Gifford* v. *Patterson, Inc.* (222 N. Y. 4, 7). In that case it is stated: " He was employed to watch the premises. [In this case the team.] Instead of doing so he prepared for himself a comfortable position and slept." In the present case, the lines (the instrument by which he controlled the horses) had fallen from his hands. He was in no position to control the horses in an emergency and it was only in such a case that they needed control. Decedent passed from his employment into oblivion. He could not have cared for his team. He was not in the performance of his duty. He could not perform his duty while unconscious. He was as much out of his employment when he voluntarily went to sleep as he would have been had he gone to the upper deck of the ferry boat to witness the scenes in the harbor. Furthermore, unlike the case of *Cleveland* v. *Rice,* he neglected to perform the very duty which he had been hired to perform. In other words, he abandoned his employ-

ment.　The accident was not a *natural* incident of the employment. The decedent did not know when he went to sleep that he was going to wake up when it was necessary to drive the team from the boat; in fact, he did not awaken and it was necessary for the deckhand to awaken him.　There is no evidence to show that he might not have been sleeping still, had he not been awakened by the deckhand.　If, while decedent was dozing, the team cared for itself, and needed no attention, credit should be given to the team rather than to any active watchfulness of the driver, nor can it be said that there was any consent on the part of the employer that the driver might go to sleep while crossing the river.　It does not appear that it was part of the terms of the employment nor that any consent had been given therefor, nor had any rule been adopted which would prevent such conduct on the part of the driver.　Why should there have been such a rule?　Would an employer ordinarily establish a rule prohibiting an employee from sleeping on the job?

The testimony of the employer was simply an expression of opinion as to what he might have done had he found one of his drivers asleep, and also as to what he personally had done in the past when acting as a driver.　The testimony of the employer does not, in this respect, define the duties of a driver other than to show that he was hired for the purpose of caring for the team.　It is further stated in *Matter of Gifford* v. *Patterson, Inc. (supra)*: " If, in connection with his employment, he was authorized or permitted to procure a chair and spend a portion of his time therein ' dozing off ' in the doorway, it was not shown before the Commission.　His injury was not received as a natural incident of his work.　It was not a risk connected with his employment or arising out of and in the course of his employment.　The acts of Gifford as found by the Commission, instead of being in the course of his employment, were directly contrary to the object and purpose for which he was employed."

The above language is peculiarly applicable to the case at bar as there was no authority or permission given for the employee to sleep.

I recommend that the award be reversed and the claim dismissed, with costs against the State Industrial Board.

COCHRANE, P. J., VAN KIRK and WHITMYER, JJ., concur; HINMAN, J., dissents, with an opinion.

HINMAN, J. (dissenting).　Claimant's working days were very long.　He worked in the summer months from three or four A. M. until six P. M.　His employer admitted the practice of such truck drivers to take a nap on the truck during the ten-minute trip on the ferry and that he himself had done so when he drove a truck.

There is no claim that the horses driven by claimant were easily frightened or unsafe to leave unwatched while in line on the gangway of the ferry boat during the trip.    The interests of his employer were not jeopardized by claimant's going to sleep nor was such jeopardy reasonably to have been apprehended.    His employer says so.    His long hours of labor made claimant sleepy.    It may have been unintentional.    He did not step out of his employment even if he voluntarily went to sleep.    He undoubtedly expected that the landing of the boat would arouse him in ample time to attend to driving his team off the boat in line with his fellow-passengers.    For some reason he overslept.    The oversleeping was not a voluntary act.    If he did not depart from his duty when he went to sleep it seems to me that he should not be deemed to have done so by simply failing to wake up in time to avoid being shaken from his seat to the ground by the action of his team in walking off the boat.    There is no claim that the team ran away or became frightened.    They simply started up without waiting for his command and guidance.    His injury may have resulted from his contributory negligence, but I think he did not depart from his employment.    It was a risk reasonably traceable to his employment due to his long hours of labor and justified by known practice approved by his employer.    It is unlike a sleeping watchman who is employed to watch and not to sleep.    (*Matter of Gifford* v. *Patterson, Inc.,* 222 N. Y. 4, 7.)    I vote for affirmance.

Award reversed and claim dismissed, with costs against the State Industrial Board.